**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| BRENDA VAZQUEZ-RIVERA, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>     v.<br><br>H&R BLOCK, INC., and H&R BLOCK TAX SERVICES L.L.C.,<br><br>          Defendants. | Civil Action No.<br><br><br>CLASS ACTION COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Brenda Vazquez-Rivera (hereinafter, "Ms. Vazquez-Rivera" or "Plaintiff") brings this action on her own behalf and on behalf of all others similarly situated, to recover treble damages and other appropriate relief based on Defendants' violations of the antitrust laws of the United States. In support of this Class Action Complaint ("Complaint"), Plaintiff alleges, with knowledge as to her own acts and those taking place in her presence and upon information and belief as to all other matters, as follows:

## I.  NATURE OF ACTION

1.     This case challenges Defendants' anticompetitive No Poach agreements for corporate and franchise employees in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

2.     H&R Block, Inc. is the "largest consumer tax services provider" in the United States. In the 2018 fiscal year, H&R Block reported revenues of over $3.1 billion with over 23 million tax returns prepared worldwide.

3.     Among other tax preparation services, H&R Block, Inc. provides in-person tax preparation assistance and services at approximately 10,000 offices across the United States. H&R Block utilizes a franchise business model, and as a result, H&R Block has both corporate-owned offices and franchise-owned offices. As of 2018, there are approximately 3,290 franchise offices and 6,690 corporate-owned offices.

4.     Tax preparation employees, like other employees in any labor market, benefit when potential employers compete for their services. Compensation among employers in a labor market creates leverage for skilled personnel to obtain higher wages, compensation, benefits, and increase in job mobility.

5.     Beginning at least by January 2009, and continuing until at least May 2018, Defendants and their currently unidentified co-conspirators engaged in a conspiracy with respect to the recruitment of employees and potential employees, including but not limited to, agreements not to solicit or recruit each other's employees without prior approval. Defendants formed, entered into, carried out, and enforced the anticompetitive agreement, combination, or conspiracy described herein. Defendants orchestrated, dispersed, and enforced the agreement among themselves and all franchisees, including at least in part through an explicit contractual

prohibition ("No Poach clause") contained in the standard H&R Block franchise agreement. The conspiracy, which is a *per se* violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, limited Plaintiff and Class members' job mobility and suppressed their wages, compensation, and other employee benefits below the levels that would have been available to them in a competitive market, absent the conspiracy.

6.     The standard H&R Block franchise license agreement entered by franchisees with H&R Block includes a "Restriction on Competition" clause, which provides "During the term of this Agreement, neither Franchisee nor any of the Franchisee's Associates will, without H&R Block's prior written consent… Solicit for employment any person who is employed by H&R Block or by any other franchisee of H&R Block." H&R Block corporate and H&R Block franchisees both agreed not to recruit or solicit employees from each other. Independent H&R Block franchises also agreed not to recruit or solicit employees from other franchise locations.

7.     The purpose and effect of the conspiracy was to limit employees' job mobility and to suppress their wages, compensation, and other employee benefits. As a result, H&R Block employees, including Plaintiff and Class members, were unable to seek employment with any other H&R Block locations, and as a direct result, the No Poach agreements severely decreased employment options available to H&R Block employees. Defendants' anticompetitive practices have harmed Plaintiff and Class members.

## II.  THE PARTIES

8.     Plaintiff Brenda Vazquez-Rivera is an individual residing in Raritan, New Jersey. During the Class Period (defined below), Ms. Vazquez-Rivera worked as a tax preparer and manager for Defendant H&R Block in Bound Brook, New Jersey. As a result of the alleged

conspiracy, Ms. Vazquez-Rivera's compensation was suppressed during the time she worked for Defendant.

9.      Defendant H&R Block, Inc. is a Missouri corporation headquartered at One H&R Block Way in Kansas City, Missouri. H&R Block, Inc. is a leading tax preparation and assistance company which provides services in-person, online, and through desktop and mobile application software. H&R Block, Inc. holds several wholly-owned subsidiaries in the United States.

10.     Defendant H&R Block Tax Services LLC is a Missouri limited liability company and a wholly-owned subsidiary of Defendant H&R Block, Inc. It is also headquartered at One H&R Block Way in Kansas City, Missouri.

11.     Defendants H&R Block, Inc. and H&R Block Tax Services LLC are hereinafter collectively referred to as "H&R Block."

12.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as defendants in this action and the identities of which are presently unknown, including H&R Block franchisees, as well as direct and indirect subsidiaries of Defendant H&R Block, Inc., that operate company-owned stores, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint. They have performed acts and made statements in furtherance of the conspiracy, or in furtherance of the anticompetitive conduct. Plaintiff reserves the right to name some or all of these persons and/or entities at a later date.

13.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents,

employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## III. JURISDICTION AND VENUE

14.  Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries Plaintiff and the other Class members have suffered from Defendants' violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

15.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

16.  Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391 because, during the Class Period, a substantial part of the events or omissions giving rise to Plaintiff's claims alleged herein occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and Defendants reside in, can be found in, and/or transacts business in this District.

17.  This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business throughout the United States, including in this District; (b) had substantial contacts throughout the United States, including in this District; and/or (c) was engaged in an illegal conspiracy that was, in part, entered into in this District and was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business in this District.

## IV. FACTUAL ALLEGATIONS

### A.    H&R Block Franchise Operations

18.     H&R Block was founded in 1955, and has since rapidly expanded throughout the United States. All H&R Block offices in the United States are either owned by H&R Block corporate, or by independent H&R Block franchisees.

19.     H&R Block franchises throughout the United States operate on standardized terms pursuant to a common franchise license agreement provided by H&R Block's corporate office. Corporate-owned offices and franchise offices are all competitors with each other. Simply put, H&R Block franchise offices operate as independent companies and are separate entities from H&R Block's corporate offices.

20.     Today, of the over 10,000 H&R Block office locations in the United States, approximately 3,300 of the locations are franchise owned and operated. There are both corporate-owned and franchise locations in virtually every state and in the District of Columbia.

21.     In the 2018 fiscal year, H&R Block, Inc. reported over $3.1 billion in annual revenues.

22.     H&R Block franchisees are independent contractors. Franchisees are independently owned and operated, and as stated in H&R Block's standard franchise agreement, H&R Block franchisees operates in an "independent contractor" relationship with H&R Block Defendants.

23.     H&R Block's standard franchise agreement also states that such franchisees are not "a joint venturer, joint employer, partner, agent, fiduciary, or employee" of H&R Block Defendants. The standard franchise agreement prohibits franchisees from holding themselves out as such, except when expressly authorized by H&R Block Defendants. The agreement further provides that "neither party shall be liable to any person whomsoever for any debts incurred by the other."

---

**23.     Parties Not Joint Venturers.**

Neither party hereto is or shall be construed as a joint venturer, partner, agent, fiduciary or employee of the other, and neither party shall have any power to bind or obligate the other, and neither party shall be liable to any person whomsoever for any debts incurred by the other. The sole rights and obligations of the parties are as set forth in this Agreement. It is expressly agreed that the parties intend by this Agreement to establish the relationship of franchisor and franchisee. It is further agreed that Franchisee will not hold itself out as the agent, employee, partner or joint venture of Block. Franchisee expressly agrees that all employees hired or working for Franchisee shall be the employees of Franchisee and shall not, for any purpose, be deemed employees of Block or subject to Block's control.

---

24.     Within this framework, the H&R Block Franchise Disclosure Document ("FDD"), which summarizes and explains its standard franchise license agreement and practices, expressly states that H&R Block, including its corporate-owned locations, and its franchisees are in competition: "[The franchisee's] direct competition from national and local tax return tax preparation firms will include [H&R Block] affiliates."

25.     The FDD also states that its franchisees are competitors both (1) with other franchisees and (2) with H&R Block's corporate-owned offices. The FDD further provides that franchisees are to operate within a defined "Franchise Territory," but do "not, however, receive an exclusive Franchise Territory." On the contrary, as the FDD clarifies, franchisees may "face competition from other offices that [H&R Block] franchise[s] or own[s], or that are franchised or owned by [H&R Block's] parent or affiliates, or from other channels of distribution or competitive brands [H&R Block] control[s]."

26.     Additionally, the FDD provides that H&R Block or its affiliates may provide the same products and services as the franchisee in the "Franchise Territory" "regardless of proximity to or economic impact upon [the] Franchised Business."

**B.     H&R Block's Independent Franchisees Possess Exclusive Employment Decision-Making Authority For Their Franchise Offices**

27.     As H&R Block's standard franchise agreement and the FDD make clear, H&R Block franchise locations, which are each independently owned and operated, are intended to, and do compete with each other as well as with H&R Block corporate-owned offices.

28.     Under the standard franchise license agreement, H&R Block franchisees are to make all employment and management decisions independent of H&R Block's corporate office. In other words, franchisees have the authority to make all personnel and employment decisions. Among other things, such franchisees possess and exercise sole and complete decision-making authority as to all employment related management decisions, including but not limited to, recruitment, hiring, firing, advancement, promotion, staffing, compensation, conditions of employment, discipline, and any other day-to-day management of employees.

29.     H&R Block's standard franchise agreement states that all decisions related to employment are to be made entirely and independently by each franchisee. Further, it states that employees of the franchise are not employees of H&R Block Defendants:

> All employees hired by or working for Franchisee will be solely the employees of Franchisee and not employees of H&R Block or subject to H&R Block's control. Specifically, Franchisee will have exclusive control over all employment related decisions, including decisions concerning hiring, firing, wages, conditions of employment, discipline, staffing, or any other day-to-day management of employees. H&R Block has no obligation or right to control any franchise employment issue.

30.     But for the conspiracy and the conduct of Defendants and their co-conspirators in furtherance of, each H&R Block franchisee would have competed with other H&R Block franchisees and with H&R Block corporate-owned locations for employees, and would have engaged in competition to solicit and recruit employees from other H&R Block locations, regardless of whether locations were owned by other franchisees or by H&R Block corporate.

**C.     The No Poach Agreements Between and Among Competing H&R Block Locations Owned by Defendants and by Franchisees**

31.     Notwithstanding the franchise license agreement's definition of the franchisor-franchisee relationship, during the Class Period, H&R Block and its franchises agreed not to compete with each other with respect to recruitment and other aspects of competition in the solicitation and recruitment of potential employees.

32.     As alleged herein, the conspiracy, including the No Poach agreement, was between and among separate economic actors pursuing separate economic interests. The agreement deprives the marketplace generally and in particular, the Class members were deprived of the benefits of free and open competition by Defendants.

33.     Up until or about May 2018, H&R Block and its franchisees were engaged in express contractual agreements that forbid competition for employees among franchisees and H&R Block's corporate-owned offices. In particular, during the Class Period, the standard language in H&R Block's franchise license agreements that franchisees have to agree to and execute includes an express No Poach provision: "During the term of this Agreement, neither Franchisee nor any of Franchisee's Associates will, without H&R Block's prior written consent… [s]olicit for employment any person who is employed by H&R Block or by any other franchisee of H&R Block."

34.     The No Poach clause was not only intended to protect H&R Block's investment in the training of employees at corporate-owned offices, but was also to protect their interest in training of franchise employees who meet the exact same training requirements.

35.     The No Poach clause also restricted franchisees from poaching employees from other franchises. This further underscores the true intent and purpose of the No Poach clause and surrounding policies—to restrict competition for employees in the market and artificially suppress wages among competing firms in a highly specialized sector.

9

36.    In addition to the No Poach clause in the franchisee standard license agreement, H&R Block also operated under the same policy to effectuate and enforce the conspiracy.

37.    Enforcing the conspiracy was a central part of the recruiting and hiring process at H&R Block's corporate-owned stores. H&R Block's online application asked applicants to disclose whether they had ever worked at H&R Block or an affiliate. This inquiry, and other similar inquiries, allowed H&R Block to flag and identify applicants who are currently, were, or had been employed by H&R Block or any of its franchisees. The purpose and effect of these questions was to enforce and perpetuate the conspiracy by identifying and preventing violations to the conspiratorial agreement.

### D.    Employee Recruitment, Hiring, and Training

38.    As one of the largest tax preparation service providers in the United States, H&R Block and franchisees have a need for tax preparation professionals who have undergone H&R Block's specialized training.

39.    At the height of the 2018 tax season, H&R Block employed over 90,000 workers, including tax professionals and administrative staff. Franchise locations employed an additional 20,000 to 30,000, mostly seasonal, employees.

40.    As tax preparation is mostly a seasonal industry, H&R Block and its franchisees must recruit and hire a large number of new and returning employees every year. In H&R Block's 2018 Form 10-K disclosure to the Securities and Exchange Commission, it highlighted that its "business is dependent on the availability of a seasonal workforce, including tax professionals, and [its] ability to hire, train, and supervise these employees."

41.    Specifically, H&R Block stated that, "[s]uccess in [the] industry depends on [its] ability to attract, develop, motivate, and retain key personnel in a timely manner, including …

those in seasonal tax preparation positions or with other required specialized expertise, including technical positions. The market for such personnel is extremely competitive, and there can be no assurance that [it] will be successful in [its] efforts to attract and retain the required personnel."

42.     As H&R Block recognized in its Form 10-K filing the regular need each tax season for qualified tax preparation workers would otherwise lead to healthy competition between H&R Block, its franchise locations, and market competitors, and thus, higher wages, benefits, compensation, and other terms of employment for employees. Instead, H&R Block conspired with its franchisees and co-conspirators to restrict employee mobility and competition in this highly specialized market. The conspiracy resulted in the intended effect, and both H&R Block corporate and franchise employees, including Plaintiff and the Class members, suffered restricted job mobility and suppressed wages, benefits, compensation, and other terms of employment.

### a.  H&R Block Specific Training Is a Prerequisite for Employment

43.     H&R Block requires all of its employees to complete H&R Block-specific educational requirements before they can even be considered for employment. H&R tax professionals are required to invest hundreds of dollars and many hours to complete this required training. H&R Block offers its "H&R Block Tax Prep Course: Income Tax Course" which provides income tax training for new and seasoned tax professionals, at numerous locations. This training course is typically held at both corporate and franchise offices. Today, the Income Tax Course provides 60 to 89 hours of instruction relating to tax forms. Participants must pay for their own course materials.

44. Upon completion of the course, students receive an H&R Block Certification. This Certification is a prerequisite for most, if not all, tax preparation positions at H&R Block's corporate and franchise offices.

45. While the H&R Block-specific training is a prerequisite for employment, completion of the training is not a guarantee that applicants will be hired by H&R Block. As the fine print explicitly provides, this course is not considered training, as it is a prerequisite to even be considered for employment at H&R Block. In fact, H&R Block's marketing materials advertise that the Income Tax Course helps individuals master their own annual returns and "can also lead to a job." Further, in order to be re-hired for subsequent tax seasons, experienced H&R Block employees must complete at least 18 to 24 hours of additional H&R Block-specific training.

46. H&R Block's marketing materials further specify that the Income Tax Course "is not intended for, nor open to any persons who are either currently employed or seeking employment with any professional tax preparation company or organization other than H&R Block [or one of its franchise offices]. During the course, should H&R Block learn of any student's employment or intended employment with a competing professional tax preparation company or service, H&R Block reserves the right to immediately cancel the student's enrollment."

47. These H&R Block-specific training requirements are the primary qualifications for open tax professional positions at corporate-owned and franchise offices. Other positions at H&R Block corporate and franchise offices, including "Senior Tax Analysts," have additional requirements, such as completion of highly specialized, H&R Block-specialized trainings and certifications.

48.    With the educational qualifications from hundreds of hours invested in H&R Block-specific training, many tax professionals at H&R Block's corporate and franchise offices are uniquely suited to working at H&R Block corporate or franchise locations. Based on H&R Block's franchise-specific training requirements for all employees, H&R Block employees should generally be highly mobile between H&R Block's corporate offices, and between different franchise offices.

49.    In the absence of Defendants' anticompetitive conduct, competition between and among Defendants and co-conspirators for H&R Block-trained workers in the highly specialized and technical tax preparation services industry, particularly within the H&R Block system, would be robust and would have increased and enhanced H&R Block employees', including Plaintiff and Class members, compensation and mobility.

### b. The H&R Block System

50.    In addition to the specialized training requirements for tax preparers, franchisees and management-level employees must also complete further specialized training in the H&R Block system.

51.    H&R Block utilizes "a distinctive system" for establishing and operating tax return preparation businesses and performing related services ("System"). According to the H&R Block FDD, the H&R Block System includes "proprietary processes, methods and software; standards, specifications and procedures for operations; procedures for management control; training and assistance; and advertising and promotional programs."

52.    Both corporate-owned and franchise offices and their employees must operate according to the H&R Block System.

53.     To ensure familiarity and compliance with the distinction H&R Block System, franchisees and their management-level employees must attend training on the System prior to their first and second tax seasons. Under the standard franchise agreement, the franchisee is responsible for the travel expenses, room, board, and wages for the training. These initial and other ongoing training sessions cover topics including franchisor/franchisee commitments, personnel management, and training programs, and the H&R Block service model.

54.     H&R Block-specific training, education, and qualification requirements, including H&R Block proprietary processes, procedures, methods, and software, as taught in H&R Block Income Tax Courses and Schools are unique. The result is that employment with a non-H&R Block tax preparation company or business is not a reasonable substitute for the employees of H&R Block corporate or their franchises.

### E.     The No-Poach Agreement Restricted Mobility and Suppressed Compensation for H&R Block Employees

55.     Defendants' conspiracy restricted, restrained, and reduced mobility of Plaintiff and Class members between H&R Block corporate-owned and franchise locations.

56.     According to information and statistics on employees and working professionals listed on H&R Block's website, of the 65,158 employees, nearly 70% are affiliated with a single corporate-owned or franchise office. *See* Figure 1. An employee associated with only one location would comply with the No-Poach Clause and conspiracy. More than 26% of employees are listed as working at multiple corporate-owned locations, and approximately 4% are affiliated with multiple offices within one franchise group (different locations owned by one franchisee). These associations would also comply with the No-Poach Clause and conspiracy. Only 0.41%, or 269 employees, are listed as affiliated with both corporate-owned and franchise offices. Finally, only 0.28%, or 187 employees, are affiliated with multiple franchise groups. Therefore, per H&R

Block's employee data, approximately 99.3% of current employees at H&R Block's corporate and franchise offices appear to be in compliance with the terms of the No-Poach Clause and conspiracy.

**Figure 1**

| Location | Employee Count | Percentage |
|---|---|---|
| 1. Single Location (Company or Franchise) | 45,458 | 69.07 % |
| 2. Multiple Company-Owned Locations | 17,215 | 26.16 |
| 3. Multiple Locations within One Franchise Group | 2,687 | 4.08 |
| 4. Both Company-Owned and Franchises | 269 | 0.41 |
| 5. Multiple Franchise Groups | 187 | 0.28 |
| 6. **Total** | **65,816** | **100.00 %** |

57.     The minuscule number of employees that are employed by both corporate-owned locations and franchise locations demonstrates not only that the No Poach Clause in the standard Franchise License Agreement is routinely enforced, but also that the H&R Block corporate-owned stores adhered to a parallel rule not to solicit or recruit employees from franchisee offices. These unlawful agreements and anticompetitive policies eliminate incentives and abilities of franchisees and corporate-owned offices to compete for employees.

58.     The conspiracy was intended to, and did, restrict employees' mobility by decreasing the pool of potential employers and eliminating competition in the hiring market. This, in turn, has led to suppressed wages, compensation, and other benefits of Plaintiff and Class members, compounded over the duration of the conspiracy.

59.     The conspiracy and its anticompetitive effects were not limited to tax professional, but it also affected managers, executives, and other H&R Block employees.

60.     H&R Block corporate and franchise employees in the areas of tax preparation, customer service, and administrative or management are paid below the average national salary for similar job titles.

61.    For example, H&R Block Seasonal Tax Preparers have an average base pay of approximately $10.86 per hour, while the Bureau of Labor Statistics ("BLS") hourly mean wage for a tax preparer is $22.67 per hour.

62.    Figure 2, below, shows the approximately average yearly earnings at H&R Block compared to national figures for comparable positions.

**Figure 2:**
**H&R BLOCK AVERAGE SALARY v. NATIONAL AVERAGE SALARY**

| Job Title | Average Salary | | Percent Below |
|---|---|---|---|
| | H&R Block | National | National Average |
| (1) | (2) | (3) | ((3)-(2))/(3) (4) |
| Senior Tax Analyst | 37,232 | 79,948 | 53% |
| Tax Analyst | 30,659 | 57,747 | 47% |
| Tax Preparer | 22,651 | 26,666 | 15% |
| Office Manager | 30,014 | 38,117 | 21% |
| Receptionist | 20,384 | 25,064 | 19% |

63.    But for the conspiracy, employee compensation at H&R Block corporate-owned and franchise offices would be significantly higher.

**F.    State Attorney Generals' Investigation Into No Poach Agreements**

64.    In July 2018, a coalition of 11 state attorney generals, led by Massachusetts Attorney General Maura Healey, sent letters to various fast food franchisors about their No Poach agreements in franchise contracts, which were very similar to H&R Block's provision, requesting information and documents from these companies. These letters provided:

> [W]e are concerned about the use of No Poach Agreements among franchisees and the harmful impact that such agreements may have on employees in our States and our state economies generally. By limiting potential job opportunities, these agreements may restrict employees' to improve their earning potential and the economic security of their families. These provisions also deprive other franchisees of the opportunity to benefit from the skills of workers covered by a

No Poach Agreement whom they would otherwise wish to hire. When taken in the aggregate and replicated across our States, the economic consequences of these restrictions may be significant.

65.    Within days of the announcement of the letters, H&R Block made public that it had ended its practice of including and enforcing No Poach Agreements in their franchise contracts.

## V.  CO-CONSPIRATORS AND AGENTS

66.    The anticompetitive and unlawful acts and conduct alleged against Defendants were authorized, ordered, or performed by Defendants and their respective directors, officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

67.    Individuals and/or entities not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

68.    Each Defendant acted as the principal, agent, or joint venturer of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein. The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged herein were consensually formed between the Defendant principals and agents.

69.    Accordingly, the Defendant principals are liable for the acts of their agents, employees, and/or representatives. Likewise, the Defendant agents, employees, and/or representatives are liable for the acts of their principals conducted by the agents, employees, and/or representatives within the scope of their explicit, implied or apparent authority.

## VI.  CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action on behalf of herself and all others similarly situated ("the Class"), pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as:

> All tax professionals and managers who worked at any H&R Block location in the United States, whether owned and operated by H&R Block or by its franchisees, during any time between January 1, 2009 and May 10, 2018 (the "Class Period").

The "United States" includes all fifty states, the District of Columbia, and all U.S. territories. "Tax professionals" includes any and all persons who worked at any H&R Block location during the Class Period and whose duties included tax return processing or processing support, tax return preparation or preparation support, tax return preparation advice, operating, writing, or debugging H&R Block propriety tax return software, or who had to complete H&R Block's Income Tax School and Course or demonstrate equivalent knowledge to qualify for his or her position at H&R Block. "Managers" include any and all persons who worked at any H&R Block location during the Class Period and whose duties included supervision or management of tax professionals as defined herein.

71.     Excluded from the Class are senior executives and personnel in the human resources and recruiting departments of the Defendants or co-conspirators and their wholly-owned subsidiaries, as well as personnel hired outside of the United States to work outside of the United States.

72.     Plaintiff does not yet know the exact size of the Class because such information is in the executive control of Defendants and their co-conspirators, but, based upon the nature of the trade and commerce involved, as well as the scope and duration of the conspiracy, Plaintiff believes that there at least thousands of Class members, and that Class members are

geographically dispersed throughout the United States. Therefore, joinder of all members of the Class is not practicable.

73.     The questions of law or fact common to the Class include, but are not limited to:

   a.   Whether the Conspiracy violated Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3;

   b.   Whether the Conspiracy and associated agreements, or any one of them, constitute a *per se* violation of the Sherman Act;

   c.   Whether the Conspiracy and associated agreements restrained trade, commerce, or competition for labor;

   d.   Whether Plaintiff and the Class suffered antitrust injury or were threatened with injury; and

   e.   The measure and amount of damages incurred by the Class.

74.     These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

75.     Plaintiff's claims are typical of the claims of the Class.

76.     Plaintiff will fairly and adequately represent the interest of the Class and has no conflict with the interests of the Class.

77.     Plaintiff is represented by counsel who are capable and experienced in the prosecution of class actions and antitrust litigation.

78.     Defendants and their co-conspirators have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

79.     Adjudicating the claims of the Class members as a class action is superior to the alternative, because it promotes the fair and efficient adjudication of the controversy alleged in this Complaint, while avoiding the risk that the prosecution of separate actions by individual members of the Class would create inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. This action presents no difficulties in management that would preclude its maintenance as a class action.

80.     The Class members are ascertainable either from Defendants' records or through self-identification in the claims process.

## VII.    ANTICOMPETITIVE EFFECTS AND LACK OF PRO-COMPETITIVE JUSTIFICATION

81.     The Conspiracy substantially reduced competition for labor. Defendants and their co-conspirators entered into, implemented, and policed these agreements with the knowledge of the overall Conspiracy, and did so with the intent and effect of fixing, restraining, and stabilizing the compensation paid to their personnel at artificially low levels.

82.     The harm not only reached individuals who sought to change their employment from one franchise or corporate office location to another, but also extended to those who had no intention of changing from one franchise or corporate office location to another, due to, *inter alia*, the companies' efforts to maintain internal equity in their compensation structures, as well as the reduction of transparency.

83.     While the Conspiracy constitutes a *per se* violation of the Sherman Act, Defendants and their co-conspirators also exploited their collective market power in the relevant market—the labor market for tax professionals and managers at H&R Block, as defined herein, in the United States.

84. Through the Conspiracy, Defendants exercised and maintained this market power, and did in fact suppress wages, benefits, and other aspects of compensation and eliminate competition.

85. The Conspiracy and the conduct of Defendants and their agents and co-conspirators in furtherance thereof did not have pro-competitive effects and were not intended to have any pro-competitive effects.

86. In the alternative, Defendants are liable under a "quick look" analysis where one with even a rudimentary understanding of economics could conclude that the arrangements and agreements alleged herein would have an anticompetitive effect on Class members and in the relevant market.

87. In the alternative, any deemed procompetitive effects that may have resulted from the Conspiracy and/or the conduct of Defendants and their agents and co-conspirators in furtherance thereof were and are outweighed by the anticompetitive harm alleged herein, including but not limited to, restricting employee mobility and suppressing wages, benefits, and other aspects of compensation.

## VIII.  EQUITABLE TOLLING AND STATUTE OF LIMITATIONS

88. While Plaintiff had knowledge of aspects of Defendants' and industry recruiting practices, Plaintiff did not have actual or constructive knowledge of Defendants' unlawful conspiracy until, at the earliest, H&R Block's public announcement that it had ended its practice of including and enforcing No Poach Agreements in franchise contracts on or about July 12, 2018. Plaintiff also did not have any reason to suspect that Defendants were illegally acting in concert to suppress wages and the labor market. At no point did Defendants inform Plaintiff that her compensation was not competitive but was instead suppressed by Defendants'

anticompetitive agreements. Plaintiff therefore did not know, did not discover, and could not have known or discovered through reasonable diligence, the existence of the conspiracy alleged herein.

89.     Conspiracies, by their nature, must be concealed. To keep the conspiracy hidden from those it affected most—their employees and prospective employees—Defendants and their co-conspirators did not publicize the No-Poach Clause of their franchise agreements. Defendants also did not inform employees of the conspiracy between H&R Block and its franchises during the application process or the new employee onboarding process.

90.     Defendants also concealed the fraud by giving false and pretextual explanations for hiring and compensation decisions, including that the decisions were based on merit, the operation of free and open competition, and other considerations, instead of pursuant to an unlawful agreement.

91.     As a result of Defendants' and their co-conspirators' successful efforts to conceal the fact and scope of the Conspiracy, the running of any applicable statute of limitations has been tolled with respect to Plaintiff's claims concerning Defendants' conspiracy.

## IX. CLAIM FOR RELIEF
### Violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3

92.     Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint, and further alleges the following.

93.     Beginning no later than January 1, 2009, and continuing until in or around May 2018, Defendants entered into, and engaged in unlawful agreements in restraint of trade and commerce, in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

94.     Defendants' agreements have included concerted actions and undertakings among themselves and their co-conspirators with the purpose and effect of: (a) fixing, reducing, and

stabilizing the wages, benefits, and other aspects of compensation of Plaintiff and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for labor.

95.     As a direct and proximate result of Defendants' combinations and contracts to restrain trade and eliminate competition for labor, members of the Class have suffered injury and have been deprived of the benefits of free and fair competition on the merits.

96.     The unlawful agreements among Defendants and their co-conspirators have had the following effects, including but not limited to:

a.  Competition among Defendants for labor has been suppressed, restrained, and eliminated; and

b.  Plaintiff and Class members have received lower compensation from Defendants than they otherwise would have received in the absence of the Conspiracy, and as a result, have been injured in their property and have suffered damages in an amount subject to proof at trial.

97.     The acts done by each Defendant as part of, and in furtherance of, their contracts, combinations, and/or conspiracies were authorized, ordered, or committed by their respective officers, directors, agents, employees, or representatives, while actively engaged in the management of each Defendants' affairs.

98.     Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

99.     Accordingly, Plaintiff and Class members are entitled to three times their damages caused by Defendants' violations of Sections 1 and 3 of the Sherman Act, as well as the

costs of bringing suit, reasonable attorneys' fees, and a permanent injunction prohibiting Defendants from entering into similar agreements in violation of the antitrust laws in the future.

## X. PRAYER FOR RELIEF

Wherefore, Plaintiff demands judgment against Defendants as follows:

a. Declaring this action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein;

b. That the contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants be adjudged to have violated Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3;

c. That Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

d. That judgment be entered for Plaintiff and the Class against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law;

e. That Plaintiff and the Class recover pre-judgment and post-judgment interest as permitted by law;

    f.   That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

    g.   For such other and further relief as is just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: January 3, 2019

Respectfully submitted,

By: /s/ *Steven A. Kanner*
Steven A. Kanner
Douglas A. Millen
Robert J. Wozniak
Brian M. Hogan
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel:    (224) 632-4500
Email: skanner@fklmlaw.com
         dmillen@fklmlaw.com
         rwozniak@fklmlaw.com
         bhogan@fklmlaw.com

Eugene A. Spector (*pro hac vice* to be submitted)
William G. Caldes (*pro hac vice* to be submitted)
Len A. Fisher (*pro hac vice* to be submitted)
**SPECTOR ROSEMAN & KODROFF, P.C.**
Two Commerce Square
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel:    (215) 496-0300
Email: ESpector@srkattorneys.com
        BCaldes@srkattorneys.com
        LFisher@srkattorneys.com

David P. McLafferty (*pro hac vice* to be submitted)
**MCLAFFERTY LAW FIRM, P.C.**
923 Fayette Street
Conshohocken, PA 19428
Tel:    (610) 940-4000
Email: dmclafferty@mclaffertylaw.com

Jeffrey S. Goldenberg (*pro hac vice* to be submitted)
Todd B. Naylor (*pro hac vice* to be submitted)
**GOLDENBERG SCHNEIDER, LPA**
One West Fourth Street, 18th Floor
Cincinnati, OH 45202-3604
Tel:     (513) 345-8291
Email: jgoldenberg@gs-legal.com
       tnaylor@gs-legal.com

Garrett D. Blanchfield (*pro hac vice* to be submitted)
**REINHARDT WENDORF & BLANCHFIELD**
W-1050 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Tel:     (651) 287-2100
Email: g.blanchfield@rwblawfirm.com

*Attorneys for Plaintiff and the Proposed Class*